AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
3/14/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ vam _____ DEPUTY

|  |  |
|---|---|
| United States of America | |
| v. | Case No.   2:22-mj-01024-DUTY |
| ISAAC CRUZ, | |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT
March 14, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ch ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between the date(s) of October 20, 2021, and December 15, 2021, in the county of Los Angeles in the Central

District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g) | Felon-In-Possession of Firearms or Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Frank Cheng*
*Complainant's signature*

Frank Cheng, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 14, 2022
_____
*Judge's signature*

City and state:   Los Angeles, California          Hon. Paul Abrams, U.S. Magistrate Judge
*Printed name and title*

AUSA: Lynda Lao (x7167)

## AFFIDAVIT

I, Frank Cheng, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since May 2008. I am currently assigned to the Los Angeles Field Division. During my time with ATF, I have investigated violations of federal statutes related to firearms, arson, explosives, murder, and narcotics offenses, and have also investigated violations of state firearms and narcotics laws. I have received extensive training on these areas of the law, which has included the following professional training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia: Criminal Investigators School (12 weeks) and the ATF National Academy's Special Agent Basic Training (14 weeks).

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint against **ISAAC CRUZ** ("**CRUZ**") for a violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm).

3.   This affidavit is also made in support of an application for a warrant to search the person of **CRUZ** as described in Attachment A.

4.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 922(a)(1)(A) (dealing

1

firearms without a license), 18 U.S.C. § 922(g)(1) (prohibited person in possession of a firearm), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), 26 U.S.C. § 5861 (possession of unregistered firearms), and 21 U.S.C. §§ 846 and 841(a)(1) (conspiracy and attempt, distribution of, and possession with the intent to distribute, a controlled substance) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachment A and B are incorporated herein by reference.

5.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, my conversations with other law enforcement officers, agents, and witnesses, and my review of reports generated by the Bureau of Alcohol, Tobacco, Firearms and Explosives. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant, and does not purport to set forth all of my knowledge of, or investigation into, this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.   **CRUZ**, a 25-year-old resident of Pomona, California, has been illegally in possession of firearms and narcotics in Los Angeles County. Between October 2021 and December 2021, **CRUZ** sold a total of nineteen firearms to people he thought were gun customers, but who were actually undercover ATF agents. **CRUZ**

2

also sold approximately six pounds of methamphetamine to undercover agents.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    CRUZ Sells Nineteen Firearms and Illegal Drugs to ATF Undercover Agents**

8.    On October 20, 2021, an ATF Confidential Informant (the "CI")[1] acting at my direction and that of other ATF agents contacted an individual on Snapchat who the CI believed to be someone he/she had purchased firearms and narcotics from in the past. When the CI reached out to the individual asking to purchase firearms posted on Snapchat, a different individual, **CRUZ**, responded. The CI had previously met with **CRUZ** from a past deal. The CI then began communicating directly with **CRUZ** via text message and recorded phone calls regarding a potential firearms deal.

9.    Between October 20, 2021, and October 29, 2021, the CI and **CRUZ** discussed the type of firearms, quantities of methamphetamine, pricing, and a meet time for a potential deal.

---

[1] In early September 2021, the subject of an illegal firearms trafficking investigation voluntarily became an ATF CI. The CI has not yet been charged for the illegal firearms trafficking conduct. The CI has a felony conviction for robbery. Information provided by the CI has resulted in numerous investigations into firearms and narcotics trafficking in the Los Angeles area. The CI identified an individual he/she knew to be engaging in the illegal trafficking of firearms. To date, ATF has paid to the CI approximately $5,265 to assist with rent and monthly bills.

CRUZ informed the CI that he wanted $1,400 for a Glock handgun, $850 for a Taurus handgun, and $3,300 for three pounds of methamphetamine. The CI and CRUZ agreed to meet on October 29, 2021, in Pomona, California to conduct a firearms and methamphetamine deal. In a series of text messages and phone calls between CRUZ and the CI that I have preserved and reviewed, I learned the following.

10. On October 29, 2021, the CI and an ATF undercover special agent (the "UC") met with CRUZ to purchase two firearms and three pounds of methamphetamine. The UC and CI arrived at a meeting location in Pomona, California (the "meet location"). The UC observed CRUZ driving a grey Mercedes bearing CA license plate 7NWR447 ("grey Mercedes"). The UC observed CRUZ exit the vehicle and walk around to the passenger side of the grey Mercedes. The CI walked toward the passenger side of the grey Mercedes and leaned into the passenger window. CRUZ showed the CI a Glock 43X 9mm handgun and a Taurus G2C 9mm handgun and asked if the CI wanted to purchase them. The CI agreed. CRUZ then showed the CI three bags of methamphetamine. The UC counted out $5,550 and paid CRUZ for the firearms and methamphetamine.

11. Upon arrival at the ATF Office, I weighed out the purchased methamphetamine and realized that the purchased amount exceeded the agreed upon amount. CRUZ had given the UC and the CI more methamphetamine than was originally agreed upon. The CI was directed to contact CRUZ to inform him that he has sold more than the amount agreed upon. The CI informed CRUZ that he/she will pay him back at a later date. The methamphetamine was

tested at the DEA laboratory and determined to be approximately 2,694 grams of methamphetamine.

12.   Between October 29, 2021 and November 5, 2021, the CI and **CRUZ** discussed the type of firearms, the amount owned for the extra methamphetamine, pricing, and another meet time. **CRUZ** informed the CI that he owed $2,850 for the extra methamphetamine from the last deal. The CI and **CRUZ** agreed to meet on November 5, 2021, in Pomona, California to conduct another firearms deal. In a series of text messages and phone calls between **CRUZ** and the CI that I have preserved and reviewed, I learned the following.

13.   On November 5, 2021, the UC and CI arrived at the meet location to purchase one firearm and to pay for the extra methamphetamine **CRUZ** accidently gave the UC and CI at the October 29, 2021, deal. The UC observed **CRUZ** driving a Chrysler bearing CA license plate 8FQX684 (the "Chrysler"). The UC observed **CRUZ** exit the vehicle and meet with the CI at the passenger side of the Chrysler. **CRUZ** stated there was a mistake in weighing out the bags of methamphetamine. The UC counted out $3,850 and paid **CRUZ** for a Bersa Firestorm .380 caliber handgun and the extra three pounds of methamphetamine from the prior deal.

14.   Between November 5, 2021 and November 16, 2021, the CI and **CRUZ** discussed the type of firearms, pricing and meet time for another deal. The CI and **CRUZ** agreed to meet on November 16, 2021, in Pomona, California to conduct the firearms deal. In a

series of text messages and phone calls between **CRUZ** and the CI
that I have preserved and reviewed, I learned the following.

15.  On November 16, 2021, **CRUZ** called the CI and informed
the CI that he no longer had five firearms for sale. **CRUZ**
informed the CI that he has three firearms available for $4,300.
Shortly after, the UC and CI arrived at the meet location to
purchase three firearms. The UC observed **CRUZ** exiting the grey
Mercedes and walking towards the rear of the UC vehicle. The UC
and CI exited the UC vehicle and greeted **CRUZ**. The UC opened the
trunk of the UC vehicle and **CRUZ** placed the firearms into the
trunk. The UC inspected the Intratec TEC-9 handgun, Glock 19X
9mm handgun, and Glock 23 40 caliber handgun. The UC proceeded
to count out $4,300 and paid **CRUZ.**

16.  Between November 28, 2021, and December 1, 2021, the
CI and **CRUZ** discussed types of firearms, pricing, and another
meet time. **CRUZ** informed the CI he wanted $2,800 for an AK
rifle, $900 for a .357 Magnum handgun, $1,000 for a 1911
handgun, $1,100 for a Zanik handgun, $800 for a Taurus handgun,
and $850 for a .38 Special handgun. The CI and **CRUZ** agreed to
meet on December 1, 2021, in Pomona, California to conduct the
firearms deal. In a series of text messages and phone calls
between **CRUZ** and the CI that I have preserved and reviewed, I
learned the following.

17.  On December 1, 2021, the UC and CI arrived at the meet
location to purchase four firearms and ammunition. The UC
observed the grey Mercedes arrive at the meet location with two
other individuals. **CRUZ** exited the vehicle and walked towards

the rear passenger side of the grey Mercedes. The CI exited the UC vehicle and walked toward the rear of the driver side of grey Mercedes. **CRUZ** opened the rear passenger side door and removed a black and silver case containing ammunition. The CI removed a bag from the grey Mercedes and placed it into the trunk of the UC vehicle. The UC inspected the bag, which contained a Century Arms RAS47 7.62 caliber rifle, a Armscor 1911 9mm handgun, a Taurus TCP 3.80 caliber handgun, and a Smith & Wesson 36, .38 caliber handgun. The UC proceeded to count $5,600 and paid **CRUZ**. **CRUZ** returned $50 as change.

18.  Between December 9, 2021, and December 15, 2021, the CI and **CRUZ** discussed types of firearms, pricing, and a meet time for another deal. **CRUZ** informed the CI he wanted $1,400 for a Glock handgun, $1,150 for a Ruger handgun, $1,300 for a M&P Shield handgun, $1,100 for a Mossberg shotgun, $1,600 for an Archangel rifle, $2,900 for an AR-15 sniper rifle and $1,900 for an AR-15 rifle. The CI and **CRUZ** agreed to meet on December 15, 2021, in Pomona, California to conduct the firearms deal. In a series of text messages and phone calls between **CRUZ** and the CI that I have preserved and reviewed, I learned the following.

19.  On December 15, 2021, the UC and CI arrived at the meet location to purchase nine firearms. The UC observed **CRUZ** driving the Chrysler. The UC observed **CRUZ** exit and remove a black trash bag from the rear seat. **CRUZ** walked over and handed the black trash bag to the UC. **CRUZ** then removed a pistol from the pocket of his sweatshirt and placed it in the trunk of the UC vehicle. **CRUZ** also removed a bag from the Chrysler and placed

it in the trunk of the UC vehicle. Lastly, **CRUZ** handed the UC a multi-colored bag containing one long gun and placed a tan long gun bag in the trunk of the UC vehicle. The UC counted out $15,400 and paid **CRUZ** for a Anderson Manufacturing AM-15 223 caliber rifle, a Mossberg 12-gauge shotgun, an Aero Precision M5 308 caliber rifle, a Palmetto PA-15 233 caliber rifle, a Glock 43 9mm handgun, a Smith & Wesson MP9 9mm handgun, a Glock 43 9mm handgun, a Ruger EC9S 9mm handgun, and a Ruger 10/22 22 caliber rifle. **CRUZ** returned $50 as change.

**B.   CRUZ's Criminal History**

20.   On or about March 8, 2022, I reviewed **CRUZ**'s criminal history, or "rap" sheets. Based upon my review of the rap sheets, I learned that **CRUZ** has been convicted of the following felony offense, which is punishable by a term of imprisonment exceeding one year:

a.   On or about April 13, 2015, **CRUZ** was convicted of a violation of California Penal Code 25400(3), carrying a concealed weapon in a vehicle, in the Superior Court of California, County of Los Angeles, case number KA12449, for which a suspended sentence and three years' probation were imposed.

**C.   Interstate Nexus**

21.   On or about January 17, 2022, I spoke with ATF SA David Gonzalez, who is certified as an expert in firearms and ammunition interstate nexus, regarding the 556 caliber Anderson Manufacturing rifle that **CRUZ** possessed and sold to the UC and CI on December 15, 2021. Based on my conversation with SA

Gonzalez, and on information in the ATF reports that I reviewed,
I know that 556 caliber Anderson Manufacturing rifles are not
manufactured in California. The 556 caliber Anderson
Manufacturing rifle, bearing serial number 20209213, which ATF
seized on December 15, 2021, was found in California. Because
the rifle was found in California, I believe that it has
traveled in and affected interstate commerce.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

22.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds. Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale, and distribution of
illegal drugs. The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their persons, and on their cell phones and other digital
devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

23.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such on their persons and in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the

unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

24.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, email, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **CRUZ'**s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **CRUZ'**s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

15

27.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.      CONCLUSION

28.   For all the reasons described above, there is probable cause to believe that **CRUZ** has committed a violation of Title 18, United States Code, Section 922(g)(1) (felon in possession of a firearm).

29.   Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the person, including digital devices, of **CRUZ**, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  14th  day of
 March    , 2022.

_____
HONORABLE PAUL ABRAMS
UNITED STATES MAGISTRATE JUDGE